UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------x
PATRICE M. JACKSON,

                Plaintiff,

    -against-

MICHAEL J. ASTRUE, COMMISSIONER OF
SOCIAL SECURITY,

                Defendant.
------------------------------------------------------------x

**MEMORANDUM AND ORDER**
Case No. 09-CV-1290 (FB)

*Appearances:*
*For the Plaintiff:*
BARRY SIMON, ESQ.
Simon & Gilman, LLP
91-31 Queens Boulevard
Suite 411
Elmhurst, New York 11373

*For the Defendant:*
LORETTA E. LYNCH, ESQ.
United States Attorney
Eastern District of New York
By:    ARTHUR SWERDLOFF, ESQ.
       Assistant United States Attorney
       271 Cadman Plaza East
       Brooklyn, New York 11201

**BLOCK, Senior District Judge:**

Plaintiff, Patrice M. Jackson ("Jackson"), seeks review of the final decision of the Commissioner of Social Security ("Commissioner") denying her application for disability insurance benefits ("DIB") under the Social Security Act ("the Act"). Both parties move for judgment on the pleadings pursuant to Rule 12(c) of the Federal Rules of Civil Procedure.

Jackson argues that, in determining her residual functional capacity ("RFC") the Commissioner failed to, (1) grant proper weight to her principal treating physician's medical opinion, and (2) properly evaluate her complaints of severe pain and other symptoms due to her fibromyalgia, as well as symptoms related to her depression. She

seeks remand for the calculation of benefits or, alternatively, for further evidentiary proceedings.

For the reasons stated below, Jackson's motion is granted and the Commissioner's is denied. The case is remanded solely for the calculation of benefits.

I

The following procedural history accounts for the duration — now more than nine years — of Jackson's DIB application proceedings. Jackson applied for DIB on May 17, 2001, alleging disability due to muscle weakness, severe joint stiffness and severe pain — symptoms consistent with prior diagnoses of fibromyalgia. After her application was denied, she had a hearing before an Administrative Law Judge ("ALJ"); in the interim, she had been hospitalized for nine days for major depression, with suicidal ideation. At the hearing, the ALJ considered evidence of both her fibromyalgia and depression, but ruled that Jackson was not disabled because she could perform her past relevant work as a receptionist, administrative assistant and office manager. *See* ALJ Decision, Dec. 17, 2003. After the Appeals Council denied review, Jackson sought judicial review in the district court, which, pursuant to the parties' stipulation, remanded for further proceedings without passing on the merits. *See Jackson v. Barnhart*, No. 06-CV-397 (NGG) (E.D.N.Y. Sept. 18, 2006). The Appeals Council then returned the case to the same ALJ with instructions to reevaluate the medical evidence, obtain a current consultative psychiatric evaluation, and offer the claimant the opportunity for a further hearing. After receiving additional medical evidence, including a current medical report from Jackson's long-term principal treating physician, and taking further testimony, the ALJ again concluded that

2

Jackson was not disabled because she could perform her past relevant work, but solely as a receptionist. Jackson then chose to bypass the Appeals Council and seek direct judicial review in the district court.[1]

## II

The Administrative Record ("AR") consists of the combined record of both prior proceedings.

In applying the requisite steps for evaluating DIB claims, the ALJ on remand determined that Jackson: (1) was engaged in substantial gainful activity; (2) had a medically determinable impairment or combination of impairments that was severe; (3) had an impairment that did not meet or medically equal an impairment listed in C.F.R. § 404, Subpart P, Appendix 1; but (4) retained the RFC to perform her past relevant work as a receptionist (which he considered light work) in a low-stress environment. *See* 20 C.F.R. § 404.1520(b)-(f) (setting forth the first four steps of the prescribed five-step analysis).[2]

---

[1] When a case is remanded by a district court and, in turn, to an ALJ for further proceedings, the decision of the ALJ constitutes the final decision of the Commissioner unless the Appeals Council thereafter assumes jurisdiction (1) at the claimant's request, or, (2) absent such request, in its discretion within 60 days after the ALJ's decision. *See* 20 C.F.R. § 404.984(a)-(d). Here, the claimant did not request review of the ALJ's decision by the Appeals Council, and the Appeals Council chose not to exercise jurisdiction; hence, the claimant returned directly to the district court.

[2] Since the ALJ decided that Jackson could perform her past relevant work, he did not have to address the last step, namely, whether she could do any work at all in the national economy given her RFC, age, education and work experience. *See* 20 C.F.R. § 404.1520(g)(setting forth the fifth step in the five-step analysis).

The ALJ reached these conclusions mostly by reviewing the medical records from the prior hearing but, in coming to his ultimate conclusion that Jackson had the RFC to still work as a receptionist, he essentially relied on the reports of two of the Commissioner's consultative employees from the first hearing, neither of whom examined her: D. Abrams, a disability analyst[3] who was not a medical professional[4] and Dr. S. Bonete, an agency medical consultant — each of whom had simply submitted RFC assessment forms. The ALJ also considered the testimony of Dr. Sharon Grand, a psychologist who testified for the Commissioner as to Jackson's mental condition at the second hearing.

Abrams concluded on a physical RFC assessment form that Jackson could, over the course of an eight hour work day, (1) occasionally lift up to 20 pounds, (2) frequently lift up to 10 pounds, (3) stand and/or walk for up to six hours, and (4) sit for up to six hours. *See* AR at 297-304. Dr. Bonete concluded on a mental RFC assessment form that Jackson was able to "adapt [to] doing simple routine tasks in a low stress environment." *Id.* at 295. And Dr. Grand testified that Jackson should be limited to work in a low-stress environment. *See id.* at 788. Thus, the ALJ concluded that Jackson "can perform simple and repetitive work related tasks involving the ability to sit, stand and walk for as many as 6 hours in an 8 hour day," involving "low levels of work related stress," and "can lift or carry a[s] many as 20 pounds occasionally." *Id.* at 591.

---

[3] A disability analyst is a state employee who makes disability determinations at the initial stage of the administrative process.

[4] D. Abrams crossed out the words "Medical Consultant" on the assessment form's section for the "Medical Consultant's Signature," which he/she signed.

In reaching his determination, the ALJ made short shrift of the current medical report of Dr. Thomas Molnar, dated February 18, 2007. In his report, Dr. Molnar stated that he was a family practitioner who first treated Jackson on January 21, 1999, and that she had been disabled due to fibromyalgia and depression since May 2, 2000. Dr. Molnar further stated that he most recently treated her in January 2007, that her prognosis was "poor," and, contrary to the RFC assessments rendered by the Commissioner's team of consultants, he opined that, because of her fibromyalgia and depression, Jackson (1) could only sit for up to four hours per day, (2) could only stand or walk for up to one hour per day, (3) could only lift or carry up to five pounds, (4) could not use her hands or feet for repetitive action, and (5) had difficulty dealing with low levels of stress. AR at 701 - 02-A (Medical Report by Treating Physician, including Physical Functional Capacity Evaluation). He also stated that "performing work-related activities on a regular and continuous basis" would cause her condition "to deteriorate" because she was "not able to be around people." *Id.* at 701.[5]

In rejecting Dr. Molnar's assessments, the ALJ stated that Dr. Molnar "presented no evidence in support of his opinion" that Jackson was disabled "due to a combination of physical and mental impairments," reasoning that "[t]here is no evidence

---

[5] At the first hearing, the ALJ was in possession of a prior medical report from Dr. Molnar, dated February 2, 2002. *See* AR 307-08 (Medical Report by Treating Physician). Although the report stated that Jackson had been disabled since May 2, 2000 with "fibromyalgia, hypothyroid, depression," it differed markedly from the current report in that it (1) did not contain a prognosis, (2) stated that Jackson's condition would not deteriorate by "performing work related activities on a regular and continuous basis," *id.* at 307, and, (3) critically, did not evaluate her physical functional capacities, *id.* Not surprisingly, the ALJ made no mention of Dr. Molnar's inadequate report in his first decision.

that fibromyalgia has been disabling . . . in light of largely normal neurological findings," and that Dr. Molnar never treated Jackson for depression. AR at 593.

At the second hearing, Jackson testified that she saw Dr. Molnar once or twice a month, that she suffered from severe joint and muscle pain, muscle weakness and crying spells, and that she was dependent on her husband for her daily care and household maintenance. The ALJ discounted her testimony as to the intensity, persistence and limiting effects of her symptoms, finding her subjective complaints to be "exaggerated" and lacking credibility because they were "not consistent with the medical evidence of record," and "inconsistent with [the ALJ's] residual functional capacity assessment." AR 592 - 93. In evaluating her complaints of physical pain, the ALJ considered the evidence of Jackson's musculoskeletal condition to be "vague, contradictory and generally not conclusive." AR at 592. With regard to her symptoms related to her depression – including crying spells and dependence on her husband – the ALJ discounted Jackson's testimony primarily because she only suffered one episodic event, albeit one that required a nine-day hospitalization, accompanied by suicidal ideation.

Jackson contends that the ALJ failed to apply the treating physician rule in rejecting Dr. Molnar's opinion, and improperly discounted her subjective complaints of pain and her symptoms of depression.

### III

In reviewing a determination of the Commissioner, "a district court must determine whether the correct legal standards were applied and whether substantial evidence supports the decision." *Butts v. Barnhart*, 388 F.3d 377, 384 (2d Cir. 2004).

Substantial evidence is "more than a mere scintilla," and should be that which "a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (internal quotations marks and citation omitted).

## A. Treating Physician Rule

"With respect to the nature and severity of [a claimant's] impairment[s], [t]he [Social Security Administration] recognizes a 'treating physician' rule of deference to the views of the physician who has engaged in the primary treatment of the claimant." *Burgess v. Astrue*, 537 F.3d 117, 128 (2d Cir. 2008) (citations and internal quotation marks omitted). "According to this rule, the opinion of a claimant's treating physician as to *the nature and severity of the impairment* is given 'controlling weight' so long as it 'is well-supported by medically acceptable clinical and laboratory or diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record." *Id.* (emphasis added)(quoting 20 C.F.R. § 404.1527(d)(2)).

If the ALJ does not give the treating physician's opinion controlling weight, he must "give *good reasons* in his notice of determination or decision for the weight [he] gives [the claimant's] treating sources's opinion." *See Clark v. Commissioner of Social Security*, 143 F.3d 115, 118 (emphasis added) (quoting 20 C.F.R. § 404.1527(d)(2)). The ALJ must also apply various factors to decide how much weight to give the opinion if not controlling. *Shaw v. Chater*, 221 F.3d 126, 134 (2d Cir. 2000).[6]

---

[6] These factors include: "(i) the frequency of examination and the length, nature, and extent of the treatment relationship; (ii) the evidence in support of the opinion; (iii) the opinion's consistency with the record as a whole; and (iv) whether the opinion is from a specialist." *Shaw*, 221 F.3d at 134.

If Dr. Molnar's opinion had been given controlling weight, the ALJ could not have determined that Jackson could have performed light work as a receptionist in a low-stress environment. Performing a full or wide range of light work "involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds," and "a good deal of walking or standing" or "sitting most of the time with some pushing and pulling of arm or leg controls." 20 C.F.R. § 404.1567(b). Dr. Molnar opined that Jackson could lift or carry at most five pounds and was severely limited in the amount of time she could sit (four hours) or stand and/or walk (one hour); these limitations would disqualify her from performing even sedentary work.[7]

Moreover, the ALJ's finding that Jackson could perform repetitive work and work in a low-stress environment was at odds with Dr. Molnar's conclusion that she could not use her hands or feet for repetitive action and had difficulty dealing with even low levels of stress. In addition, the ALJ's belief that Jackson had the RFC to perform work as a receptionist — a job that involves answering phones and greeting people — contradicts Dr. Molnar's assessment that she was "not able to be around people."

Under the treating physician rule, the ALJ could have discounted Dr. Molnar's medical opinion if he had provided *good reasons*. He did not. Critically, it was improper for the ALJ to conclude that there was no evidence that Jackson's fibromyalgia

---

[7] Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met. *See* 20 C.F.R. § 404.1567(a); Soc. Sec. Rul. 96-9p ("'Occasionally' ... would generally total no more than about 2 hours of an 8-hour workday. Sitting would generally total about 6 hours of an 8-hour work day.").

8

was disabling "in light of largely normal neurological findings." As the Second Circuit has counseled, "there are no objective tests which can conclusively confirm the disease," *Green-Younger*, 335 F.3d at 108 (internal quotation marks and citation omitted); rather, "negative findings simply confirm a diagnosis of fibromyalgia by a process of exclusion." *Id.* at 109.

Nor was the ALJ correct in discounting Dr. Molnar's opinion regarding Jackson's depression simply because he did not treat her for it. The record reflects, to the contrary, that Dr. Molnar had periodically prescribed Lexapro, an antidepressant drug, and urged her to seek psychiatric help. Although Dr. Molnar was not a mental health specialist, as Jackson's primary treating physician he would have had "the opportunity to review the clinical findings and opinions of specialists with whom [Jackson] did consult." *Meadors v. Astrue*, No. 09-3545-CV, 2010 U.S. App. LEXIS 5923, at *5 (2d Cir. Mar. 23, 2010) (summary order). And the findings of mental health specialists — two psychiatrists who examined her after she was hospitalized — confirmed that she suffered from major depression. *See* AR at 435 (report of Dr. Shah); *id.* at 452 (report of Dr. Cervantes).

Furthermore, the medical records lend credence to the legitimacy of Jackson's physical impairments and pain, and are either consistent or not at odds with Dr. Molnar's report. Thus, as early as 2000, Dr. Sonpal, a rheumatologist, also had rendered a diagnosis of fibromylagia, *see* AR at 323, 328; *see also* AR at 329, 331 (reconfirming diagnosis in 2001); Dr. Harris, a physical therapist, and Dr. Fleischer, a neurologist, each diagnosed Jackson in 2000 with myopathy[8], *see* AR at 348, 359; Dr. Scelsa, a neurologist, noted in 2000 signs of

---

[8] Myopathy is a disease that results in muscle weakness and is associated with muscle cramps, stiffness and spasms. *See* National Institute of Neurological Disorders and Stroke, http://www.ninds.nih.gov/disorders/myopathy/myopathy.htm (last visited Sept. 21,

9

radiculopathy[9], *see* AR at 668; and, subsequent to the first hearing, Dr. Farkash, another neurologist, confirmed in 2005 that Jackson's pain was consistent with right lumbar radiculopathy, *see* AR at 691.

Dr. Molnar's long history as Jackson's primary treating physician and his familiarity with her protracted musculoskelatal condition and depression provided the "detailed, longitudinal picture" of her impairments at the heart of the treating physician rule. 20 C.F.R. § 404.1527(d)(2). However, without good reason, the ALJ rejected Dr. Molnar's opinion in favor of non-treating sources, including Abrams — a non-medical professional who submitted a physical RFC assessment without the requisite attestation. As the Court has noted, "while the Commissioner allows disability examiners to assist in completion of the RFC assessment forms, a medical (or psychological) consultant must sign the form to attest that he/she is responsible for its content, including the findings of fact and discussion of supporting evidence." *Ristano v. Commissioner of Social Security*, No. 06-CV-2206, 2007 WL 2319793, at *3 (E.D.N.Y. Aug. 9, 2007) (internal citation and quotation marks omitted). As for Dr. Grand, her opinion that Jackson could work in a low-stress environment was cryptically and conclusorily based upon her review of unidentified records, *see* AR 787-88; in any event, she confirmed that Jackson had "a psychiatric disorder that does include depression," and that her hospitalization was "for suicidal ideation." *Id.* at 788.

---

2010).

[9] Radiculopathy is a spinal abnormality that results in referred pain (i.e., pain sensed at a site that is at a distance from its origin). *See* Dan J. Tennenhouse, MD, JD, FCLM, Attorneys Medical Deskbook § 26:8 (4th ed. 2008).

10

In sum, based on this record, the ALJ should have given controlling weight to Dr. Molnar's opinion regarding the nature and severity of Jackson's impairments, and the ALJ's legal conclusion that Jackson was not disabled was consequently not supported by substantial evidence.

## B. Credibility of Jackson's Alleged Symptoms

The ALJ also failed to properly credit Jackson's subjective complaints. The Commissioner has established a two-step inquiry to evaluate the credibility of such complaints, such as pain. *See* Soc. Sec. Rul. 96-7p; 20 C.F.R. § 404.1529(c). First, the ALJ must determine whether the medical signs or laboratory findings show that the claimant has a medically determinable impairment or impairments that could reasonably be expected to produce the claimant's symptoms. 20 C.F.R. § 404.1529(c)(1). Second, the ALJ must evaluate the intensity, persistence and limiting effects of the claimant's symptoms, which requires the ALJ to make a credibility finding[10] based on the entire case record. 20 C.F.R. § 404.1529(c)(1) - (4); Soc. Sec. Rul. 96-7p.

While the ALJ recognized this two-step process, he failed to properly apply it. In the first place, it was counterintuitive to reject Jackson's physical symptoms simply because they were at odds with the ALJ's RFC assessment; rather, they had to be assessed

---

[10] Factors considered in an assessment of the claimant's symptoms, such as pain, include: (1) the claimant's daily activities; (2) the location, duration, frequency and intensity of the claimant's pain or other symptoms; (3) precipitating and aggravating factors; (4) the type, dosage, effectiveness, and side effects of any medication the claimant takes or has taken to alleviate her pain or other symptoms; (5) treatment, other than mediation, the claimant receives or has received for relief of her pain or other symptoms; (6) any measures the claimant uses or has used to relieve her pain or other symptoms; and (7) other factors concerning the claimant's functional limitations and restrictions due to pain or other symptoms. *See* 20 C.F.R. § 404.1529(c)(3)(i) -(vii).

11

*in order to determine her RFC.* Furthermore, the ALJ once again inappropriately relied upon the absence of objective medical findings, in being dismissive of Jackson's testimony about the pain she experienced from her fibromyalgia, as well as the symptoms of her depression. *See Green-Younger,* 335 F.3d at 108-09 ("As a general matter, objective findings are not required in order to find that an applicant is disabled.") (internal quotation omitted). *See also Donato v. Secretary of the Department of Health and Human Services,* 721 F.2d 414, 418-19 (2d Cir. 1983) ("Subjective *pain* may serve as the basis for establishing disability, even if ... unaccompanied by positive clinical findings of other 'objective' medical evidence.") (citation omitted). In any event, the reports from Jackson's physical therapist and neurologists constitute objective evidence of physical conditions that are clearly pain-related.

As for Jackson's symptoms related to her depression, it was inappropriate for the ALJ to dismiss her allegations of crying spells and substantial dependence on her husband as not credible because she was only hospitalized once. The ALJ, once again, inappropriately relied on objective medical evidence in assessing her credibility. "Because symptoms sometimes suggest a greater severity of impairment than can be shown by objective medical evidence alone, careful consideration must be given to any available information about symptoms." *See* Soc. Sec. Rul. 95-5p. In any event, Jackson's nine-day hospitalization, and her suicidal ideation, certainly lent credibility to her testimony, rather than put it in doubt.

In sum, the failure of the ALJ to properly assess the credibility of Jackson's complaints of pain and the manifestations of her depression, provides an additional basis

for reversal.

IV

It remains to be determined whether the case should be remanded for further evidentiary proceedings or for the calculations of benefits. The Second Circuit has provided the requisite guidance:

> In deciding whether a remand is the proper remedy, we have stated that where the administrative record contains gaps, remand to the Commissioner for further development of the evidence is appropriate. That is, when further findings would so plainly help to assure the proper disposition of the claim, we believe that remand is particularly appropriate. On the other hand, where this Court has had no apparent basis to conclude that a more complete record might support the Commissioner's decision, we have opted simply to remand for a calculation of benefits.

*Butts*, 388 F.3d at 385-86 (citations, internal quotation marks and alterations omitted).

The Court is of the firm belief that a quietus should now be served to the claimant's nine-year ordeal and remand is warranted solely for the calculation of benefits. The Court has "no basis to conclude that a more complete record might support [the ALJ's] decision." *Id.*

V

The Commissioner's motion is denied, and the case is remanded solely for the calculation of benefits.

**SO ORDERED.**

       s/Frederic Block
       FREDERIC BLOCK
       Senior United States District Judge

Brooklyn, New York
September 21, 2010

13